BEACON PLAZA SHOPPING CENTER, INC., *v.* TRI-CITIES CONSTRUCTION & SUPPLY COMPANY.

1. CONTRACTS—BUILDING CONSTRUCTION—STEEL STRUCTURE—FOUNDA-TION—PILING.

Finding of trial court that shopping center owner had contracted to do the foundation work upon which defendant was to erect steel structure and that the inadequacy of the piling was due to derelictions of plaintiff, not defendant *held,* amply supported by the evidence.

REFERENCES FOR POINTS IN HEADNOTES

[1, 5, 6] 13 Am Jur 2d, Building and Construction Contracts § 26 *et seq.*
[2, 3, 4] 17 Am Jur 2d, Contracts § 264 *et seq.*
[7] 13 Am Jur 2d, Building and Construction Contracts § 19.
[8] 17 Am Jur 2d, Contractor's Bond § 1 *et seq.*
[9] 5 Am Jur 2d, Appeal and Error §§ 839–845.

2. SAME—CONSTRUCTION OF DOCUMENTS SIMULTANEOUSLY EXECUTED.

> Instruments executed at the same time by the same parties, for the same purpose, and in the course of the same transaction, will be read and interpreted together as one instrument.

3. SAME—CONSTRUCTION OF DOCUMENTS SIMULTANEOUSLY EXECUTED.

> Contracts whereby defendant was to erect a steel building and to act as a contractor for plaintiff and a subcontract between defendant and a lumber company wholly owned by the same person who owned plaintiff, which were executed simultaneously evidenced an intent to impose responsibility for the construction of the shopping center upon plaintiff with the exception of the furnishing and erection of the steel building.

4. SAME—PRACTICAL INTERPRETATION.

> Evidence may be admitted on the practical interpretation given simultaneously executed documents, where the proper interpretation of them as to the responsibility of the parties thereunder is in dispute and the terms are not clear.

5. SAME—BUILDING—INADEQUACY OF PILING.

> Inadequacy of piling by reason of insufficient number, placement, and length to reach solid ground or bearing to support steel structure defendant had contracted to supply and erect was properly found to be a dereliction of plaintiff, not defendant, where latter duly reported to plaintiff owner when pile drivers discovered their 20-foot lengths were not reaching supporting subsoil and installation was completed pursuant to directions of plaintiff's construction supervisor without benefit of architect and civil engineer as to on-the-job inspection, hence defendant may not be held responsible for ensuing settlement of building.

6. SAME—DEFECTIVE WORKMANSHIP—SUBCONTRACT.

> Plaintiff owner may not hold a defendant contractor under a building contract liable for defective workmanship which was the responsibility of owner's sole stockholder by reason of a subcontract imposed on the contractor as a condition of granting the contract.

7. SET-OFF AND COUNTERCLAIM—BUILDING CONSTRUCTION—EXTRAS— PREPONDERANCE OF EVIDENCE.

> Trial court's allowance of defendant contractor's contested counterclaim for extras is not disturbed, where the conflicting evidence presented a fact question and record does not disclose allowance made was against the clear preponderance of the evidence.

8. SAME — BUILDING CONSTRUCTION — BONDS — CONSIDERATION FOR NOTE.

> Counterclaim for amount due on note given by plaintiff to defendant to get it to function as general contractor which could furnish a performance bond that had to be obtained in order for plaintiff to finance construction of shopping center *held*, to have been properly allowed, even though defendant is not held liable on the general contract, where obtaining performance bond necessitated that members of defendant firm and their wives execute mortgages to the bonding company and the bond was a material benefit to the plaintiff, there being consideration for the note.

9. APPEAL AND ERROR—NONJURY CASES—QUESTION FOR TRIER OF FACTS—CLEAR PREPONDERANCE OF EVIDENCE.

> The Court of Appeals does not substitute its judgment on questions of fact in a nonjury case, where the trial court's findings are based on credible evidence and the evidence does not clearly preponderate in the opposite direction.

Appeal from Ottawa; Smith (Raymond L.), J. Submitted Division 3 November 4, 1965, at Grand Rapids. (Docket No. 186.) Decided March 9, 1966.

Complaint by Beacon Plaza Shopping Center, Inc., a Michigan Corporation, against Tri-Cities Construction & Supply Co., a Michigan corporation, and Hartford Accident & Indemnity Company, a Connecticut corporation, for damages arising out of contracts to construct a shopping center. Counterclaim by defendant Tri-Cities Construction & Supply Co. for moneys owed under the contracts. Complaint dismissed and judgment entered for defendant on the counterclaim. Plaintiff appeals. Affirmed.

*McShane, Bowie & Anderson* (*Jack M. Bowie,* of counsel), for plaintiff.

*Warner, Norcross & Judd* (*Harold S. Sawyer* and *Paul K. Gaston,* of counsel), for defendants.

Holbrook, P. J. This is an appeal by Beacon Plaza Shopping Center, Inc., plaintiff-appellant, from a judgment dismissing its complaint, and from judgment for defendant-appellee Tri-Cities Construction & Supply Company on its counterclaim against plaintiff for $31,580.93. The facts of the case are somewhat complicated for they involve three written contracts, a previous oral agreement, and conflicting testimony as to the facts of the matter as well as a dispute as to the duties assumed by the parties under the agreements.

In 1957, James H. VanZylen, of Grand Haven, became interested in building a shopping center on his property in Grand Haven. He was at the time the sole owner of VanZylen Lumber Company which was engaged in the retail building supply and construction business. In the same year he organized plaintiff Beacon Plaza Shopping Center, Inc., and was the only shareholder and its president. James T. Leymon, construction supervisor and office manager of VanZylen Lumber Company, was chosen by VanZylen as its secretary and treasurer.

In 1958, VanZylen retained a Mr. Colton and his firm as architects to draw up plans for the shopping center designed for conventional construction. Mr. Hornbach of the firm was assigned this duty by Mr. Colton.

In late 1959, VanZylen asked defendant Tri-Cities Construction & Supply Company of Spring Lake (hereinafter referred to as "Tri-Cities"), the franchised dealer for Stran-Steel Buildings to quote on a steel building which would be the structural frame and roof of the shopping center.

In August, 1960, VanZylen asked Tri-Cities to give another quote for the same type but a larger steel building. Tri-Cities submitted a bid in the same month covering the furnishing and erecting of such a Stran-Steel building.

In December, 1960, at VanZylen's request, Tri-Cities gave a break-down of the items covered by its proposal showing total costs for furnishing and erecting the steel building to be $116,537.95.

Financing by first mortgage was arranged by VanZylen from a large insurance company. This mortgage was estimated by him to be about $50,000 less than needed and a second mortgage was required to be obtained. VanZylen planned through Van-Zylen Lumber Company to perform work on the center estimated at $120,734, including preparation of the site, layout, foundation footings, floors, et cetera, while Tri-Cities was to furnish and erect the steel building for $116,537.95. The remaining work, electrical, heating, and air conditioning, store fronts, doors and glazings, ceilings, and blacktop was to be contracted out to others.

Plaintiff, in order to obtain the construction money, needed performance bonds from all the various contractors. A question arose as to the ability of VanZylen to obtain a performance bond required to cover the work that he was to perform and as a result requested Tri-Cities to act as general contractor as to their work and his, and furnish bond in the amount of $237,000 and to subcontract back to him (VanZylen) all of the work excepting Tri-Cities furnishing and erecting the Stran-Steel building. Reluctantly, Tri-Cities agreed to the arrangement for a bonus of $10,000 to be paid by plaintiff by plaintiff's note payable $2,000 per year.

On January 3, 1961, the following documents were executed between the parties:

(1) Tri-Cities bid of August 29, 1960, to erect a steel building was accepted by James VanZylen on behalf of Beacon Plaza, with cost stated as $116,-537.95;

(2) Beacon Plaza and Tri-Cities entered into a contract, whereby Tri-Cities agreed to act as con-

tractor for a portion of the center for $237,272,
which provided in part:

"Article 1. Scope of Work—The contractor shall
furnish all of the materials and perform all of the
work shown on the drawings and described in the
specifications entitled architectural trades, includ-
ing all construction and parking lot, except elec-
trical, plumbing, heating, and air-conditioning, store
fronts, doors and glazing, blacktop and ceilings
which will be covered by separate contracts.   Pre-
pared by Colton and Hornbach acting as and in these
contract documents entitled the architect; and shall
do everything required by this agreement, the gen-
eral conditions of the contract, the specifications and
the drawings."

(3) A subcontract agreement was executed be-
tween Tri-Cities and VanZylen Lumber Company
whereby the latter agreed to perform for $120,734,
all of the work shown in the drawings, except:

"The furnishing and erection of the Stran-Steel
structure as furnished by the Stran-Steel Corpora-
tion job #60–5395, and supporting members and
insulation of the Stran-Steel structure as outlined
in the proposal dated August 29, 1960, and presented
to the Beacon Plaza Shopping Center, Inc., and
excepting that part of the construction not a part
of the general contractor's contract with Beacon
Plaza Shopping Center, Inc., dated 3d January,
1961."

In effect these agreements gave to VanZylen all
of the responsibility of the general contractor except
for Tri-Cities fulfilling its duties under offer of
August 29, 1960, to furnish and erect the Stran-Steel
building.

In May of 1960, VanZylen and his architect Horn-
bach met with William Wipperfurth, Jr., (an officer
of Tri-Cities) and a Stran-Steel engineer, to

discuss the substitution of a Stran-Steel building for conventional construction of the center at which time it was made known that a footing for the Stran-Steel structure required a soil bearing pressure of 4,000 pounds per square foot and VanZylen and his architect were furnished a set of Stran-Steel drawings in detail.

Hornbach started his drawings based upon the assumption that at the location there was normal or average soil conditions affording a bearing pressure of 4,000 pounds per square foot.

VanZylen hired a Robert H. Gove, a consulting engineer, to take soil boring tests of the site. These were performed to the depth of 15 or 16 feet and on July 20, 1960, Mr. Gove mailed VanZylen a report together with two copies of his findings which stated in part as follows:

"From observing this material, it would appear that * * * a load bearing pressure of around 1000 lbs. per square foot should be used for design purposes.

"If your architect has any further questions, please feel free to have him call me."

This report was shown to Hornbach by VanZylen while the plans were still in progress and it was suggested that rather than change specifications for the footings, that piling might be used under the piers supporting the Stran-Steel building. The final plans of the architect incorporated into the contract of January 3, 1961, did not require or specify pilings, with one exception.

VanZylen had entered into a special arrangement with his architect for a reduced charge of 3% whereby the architect was relieved of the duty to give on-the-job inspection.

In December, 1960, before the written contracts were signed, VanZylen was out at the site preparing

the land surface for construction. Having been advised that pilings were needed, he arranged with Tri-Cities for driving piles at a cost of $1 per foot for driving and an additional $1 per foot should Tri-Cities furnish the piles. It was indicated that Mr. Gove suggested piles of 20- to 25-foot in length and the arrangements were made on that basis.

Mr. Leymon, for VanZylen, laid out the location of the outside footings by stakes, and the employees of Tri-Cities drove the pilings within the designated areas. It appears from the evidence that a contractor doing pile driving ordinarily is working under the supervision of a civil engineer specializing in soil conditions in relation to load bearing pressures.

The lack of such supervision by an expert and the lack of on-the-job inspection by the architect brought into operation a tragedy of errors and this resulting law suit. The plaintiff, who was in fact VanZylen (he being the sole owner), obviously desired to reduce his costs and did so by electing to do without such services.

The parties to the action in December, 1960, when discussing the piling job, did not realize that the footings for the inside walls also needed pilings. However, VanZylen was put on guard when his employees objected to the manner of doing the work. VanZylen, prior to the January 3, 1961, contracts, hired a trucking firm with a bulldozer to level the site and bring in some fill dirt. This operation was under the supervision of Leymon. One of the men, Morris Johnson, objected to pushing the fill dirt over the soft mud saying that fill should never be over soft mud, but was ordered by Leymon to go ahead and do it anyway. Also, a mason, hired by VanZylen, to do some of the work at the center, strenuously objected to the use of heavy cement blocks, stating that lighter blocks could and

should be used.  He also objected to the shallow depth of the footings for the dividing walls and to pouring cement for the floors over the soft condition of the soil.  He stated that the sand that was there should be compacted before pouring the cement floors.  In spite of all these objections, Leymon ordered the mason to proceed as he instructed. These orders can be assumed to be in harmony with VanZylen's wishes for Leymon was VanZylen's supervisor in charge of construction.  A pertinent fact appears from the billings that the piling performed by Tri-Cities was allocated to VanZylen's subcontract by Tri-Cities and agreed to by Van-Zylen.

Within a year from completion of the shopping center, considerable settlement of floors inside partition footings and walls and some settlement of outside piers was experienced.  The most serious damage was caused by settlement in the W. T. Grant and Rexall stores with W. T. Grant canceling their lease.

Plaintiff, at great expense to itself, had the settled portions of the center repaired, which necessitated the driving of cement piles to a depth of 60 or more feet and tying the support for the footings of the damaged inside walls and floors to these pilings. This was in accord with recommendations of several engineering firms specializing in the business.

Plaintiff thereupon sued defendant Tri-Cities and defendant Hartford Accident & Indemnity Company named in the performance bond of Tri-Cities for the claimed damages.  Defendant Tri-Cities filed a counterclaim.  The trial court found that the plaintiff was not entitled to recover for its claimed loss and further found that Tri-Cities was entitled to recover on its counterclaim in the sum of $31,580.93, as follows:  $7,206.73, balance due on contract;

$1,892.27, bond premium; $4,000 due on $10,000 note; and, extras in the amount of $18,481.93.

Plaintiff-appellant raises 4 questions on its appeal. We will deal with them in the order presented.

(1) Was it the responsibility of appellant to determine where and how much piling should be driven and to supervise the installation of same, whereas appellee was merely to mechanically install said piling? Pertinent findings of fact by the learned trial judge appear in his opinion as follows:

"It is obvious that VanZylen intended to act as his own general contractor in the construction of the shopping center. However, in December, 1960, VanZylen discovered that he was without sufficient financial ability to secure the requisite performance bond. VanZylen secured the promise of defendant to act as general contractor for the agreed figure of $10,000 upon the stipulation that defendant would subcontract back to VanZylen all the work not covered by the Stran-Steel construction agreement. * * *

"VanZylen entered into an oral arrangement in December, 1960, with defendant to drive the piling on this project, the agreement providing that payment would be at the rate of $1 per lineal foot for driving and $1 per lineal foot for providing the piling.

"VanZylen had in his employ at the VanZylen Lumber Company, one James Leymon. Leymon had some training and experience in the building of small homes and filling stations. Leymon also was secretary of plaintiff corporation. Leymon was VanZylen's representative on the job. * * *

"It is not disputed that defendant drove piles where Leymon instructed its employees to do so and according to the number Leymon requested.

"When the masons began putting up the cement block wall it was discovered that the footings were settling. With this information VanZylen and

Leymon went to defendant, and its foreman sug-
gested splicing the piles to secure a solid bearing.
This was done and the work progressed.   *   *   *

"Plaintiff claims that the above paragraph (gen-
eral contract) requires defendant to provide the
necessary piling and install them to meet the needs
of the structure to be erected.  The testimony in-
dicates that VanZylen had already undertaken to
handle the piling by contracting with defendant
prior to January 3, 1961, to drive the piling on a
footage basis, by providing some of the piling him-
self, and by supervising defendant's employees on
the job.   *   *   *

"We are told by the testimony that soil conditions
are a matter for a civil engineer and that architects
and contractors depend upon the knowledge and
findings of the civil engineer.  Defendant knew that
the architect had the findings of Gove before him
when he drew up the drawings and indicated where
the piling should be driven.  In retrospect it now
appears that many more piling were needed for the
job and that piling on the interior walls were neces-
sary.

"The court finds that plaintiff relied upon the skill
and knowledge of the architect and upon the knowl-
edge of VanZylen and Leymon, its president and
secretary, in determining the adequacy of the piling.
There is nothing in the oral agreement of December,
1960, between these parties to indicate that defend-
ant undertook to determine where the piling should
be driven and in what numbers.  As between these
parties there is nothing in the general contract to
indicate that plaintiff abdicated its role as supervisor
of the piling work and that defendant was required
to assume it.  The conduct of the parties remained
the same after January 3, 1961, insofar as their
relations with each other was concerned.  Plaintiff
should not now be allowed to complain of the results
of its own derelictions.   *   *   *

"The court finds that the contractual agreements
between these parties and between VanZylen and

defendant, provide only that defendant drive piling where VanZylen wanted them to, and to erect a Stran-Steel structure on a foundation provided by VanZylen. This they did. Plaintiff should not be allowed to recover for any defects in the foundation resulting in damage to the structure."

These findings of fact are amply supported by the evidence.

In 12 Am Jur, Contracts, § 246, p 782, we find:

"The general rule is that in the absence of anything to indicate a contrary interpretation, instruments executed at the same time by the same parties, for the same purpose and in the course of the same transaction will be read and interpreted together, it being said that they are, in the eye of the law, one instrument."

As between these parties, the three instruments of January 3, 1961, may be combined and in so doing, we find the effect is to place on plaintiff, owner (solely owned by VanZylen) and VanZylen Lumber Company, subcontractor, (solely owned by VanZylen) the responsibility for the construction of the shopping center excepting the duty of Tri-Cities to furnish and erect the Stran-Steel building. Applying this rule to the case at hand we review the conduct of the parties as evidenced by the following facts: (a) VanZylen hired a consulting engineer to take borings of the site six months before the date of the contracts; (b) he hired defendant Tri-Cities to drive the pilings on a per foot basis a few weeks before the date of the contracts, and in accord with a report from the civil engineer; (c) VanZylen exercised control through Leymon, his supervisor of construction, of the pile driving both before and after the date of the contracts; (d) VanZylen controlled all of the work on the project excepting Tri-Cities erecting of the Stran-Steel building; (e)

VanZylen's refusal through Leymon to heed advice from bulldozer operator and a mason hired by him, that the footings for the inside columns were improperly placed as to depth and that the subsoil for the floor was improperly prepared; (f) VanZylen's employing an architect and civil engineer to assure a proper building being constructed and then proceeding with construction without their presence and on-the-job inspection; (g) and VanZylen assuming the work of a general contractor by reason of requiring Tri-Cities to subcontract back to him all the work excepting the furnishing and erecting of the steel building and at a figure set by VanZylen.

Where the proper interpretation of a contract as to the responsibility of the parties thereunder is in dispute and the terms are not clear, evidence may be admitted on the practical interpretation given it by the parties to aid in determining the meaning to be given legal effect. *Davis* v. *Kramer Bros. Freight Lines, Inc.* (1960), 361 Mich 371.

We conclude that on the facts and the law as between these parties the trial court properly held against the plaintiff on the first question of error raised by appellant.

For convenience, we join the second and third questions raised by plaintiff-appellant in its brief. (2) Was appellant fully informed by defendant-appellee Tri-Cities of the inadequacy of the ultimate piling? (3) If appellee did report the inadequacy of the piling to the appellant, did the appellee thereby fulfill its full responsibility to appellants?

Applicable findings of fact of the trial judge as to these questions appear in his opinion as follows:

"In the course of driving the piles, defendant's employees discovered that they were not reaching solid ground or bearing with their 20-foot lengths. This information was given Leymon. The only

·resulting change in driving the piles was to drive two piles along side each other to provide so-called friction piling.      *      *      *

"The court is of the opinion that VanZylen was fully informed by defendant as to the inadequacy of the piling. Certainly, VanZylen was aware of the failure of the footings to support the wall and the necessity of splicing the piles and of driving them to a supporting depth. VanZylen even now does not claim that defendant did not install piling where the drawings indicated, he admits that they did. However, plaintiff claims that the general contractor should have insisted on further soil borings and exploration of the subsoil to insure adequate bearing strength.      *      *      *

"The court is of the opinion that the root of the trouble was plaintiff's desire to cut corners in the cost of construction, and that the work suffered for want of a competent project engineer, or architect, with on-the-job inspection duties. These duties were assumed by Leymon. It can only be suspected that he was carrying out the orders of VanZylen in matters of construction policy. It is the further opinion of the court that defendant carried its full responsibility when it reported the inadequacy of the piling to plaintiff."

We find that these findings of fact have adequate support in the record. The notice of inadequacy of piling given by Tri-Cities to plaintiff being sufficient as found by the trial judge, we face the question, did appellee thereby fulfill its full responsibility to the appellant? Having previously ruled that construing the three contracts together permitted the conclusion that plaintiff VanZylen assumed the responsibilities of general contractor and he having by choice dispensed with his architect and civil engineer as to on-the-job inspection and having taken over their duties controlling the construction through his supervisor, Leymon, we are precluded

from saying that Tri-Cities failed to fulfill its full responsibility to appellant.

Appellant cites 17A CJS, Contracts, § 515(e), p 857, as authority for the rule that the builder is responsible for defects caused by defects in the soil and refers this Court to the supporting cases of *Rubin* v. *Coles* (1931), 142 Misc 139 (253 NYS 808), and *Dearstine* v. *Dunckel* (1926), 130 Misc 281 (223 NYS 234).

We cannot quarrel with the rule contained in those cases as applied to the facts related therein. However, the facts in our case at hand are easily distinguished and therefore, the cases cited are not analogous.

To allow plaintiff owner to hold defendant contractor under a building contract liable for defective workmanship when in fact, the claimed defective workmanship was the responsibility of plaintiff's sole stockholder by reason of a subcontract imposed on the contractor as a condition of granting the contract, would in effect award plaintiff for its own breach and failure to perform properly and cannot be sanctioned under any known principle of the law.

The appellant refers the court to other authorities to substantiate its position. These need not be considered because they are inapplicable to the peculiar facts presented in the case at hand.

The last question raised by appellant on appeal, is appellee, Tri-Cities, entitled to counterclaim damages in the amount of $31,580.93? The balance due on the contract of $7,206.73 and the bond premium of $1,982.27 was not contested. The extras in the amount of $18,481.93 were in most part contested, as was the $4,000 due on the $10,000 note given as a bonus. The extras that the trial court found appellee entitled from appellant was based upon conflicting evidence which presented a fact question. We cannot say it is against the clear preponderance

of the evidence. The $4,000 awarded as due on the $10,000 note presents a more difficult problem. It is true that the defendant Tri-Cities was held not liable as between these parties on the contract, and therefore, Hartford Accident & Indemnity Company, a Connecticut corporation, not responsible on the bond. However, the performance bond under the general contract had to be obtained in order for plaintiff to draw the money from the finance institution to pay for the construction, and no doubt, to authorize the original loan. In order to obtain the performance bond, defendant Tri-Cities was required to execute mortgages, from the individual members of the firm and their wives, to the bonding company. The obtaining of this bond was of material benefit to plaintiff and therefore, the $10,000 note given by plaintiff to defendants was with consideration.

In summing up, we conclude that the trial court's findings of fact are based upon credible evidence and we cannot say that the evidence clearly preponderates in the opposite direction. We, therefore, do not disturb it. *Straith* v. *Straith* (1959), 355 Mich 267; *Insurance Company of North America* v. *Schuneman* (1964), 373 Mich 394; *Osius* v. *Dingell* (1965), 375 Mich 605.

The judgment dismissing plaintiff's complaint is affirmed. Judgment for defendant and against plaintiff for $31,580.93 is also affirmed. Costs to appellees.

BURNS and J. H. GILLIS, JJ., concurred.